**GEORGE E. WARREN CORPORA-TION, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–1467.

United States Court of Appeals,
Federal Circuit.

Aug. 28, 2003.

Steven H. Becker, Coudert Brothers LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were Paul A. Horowitz and Christopher E. Pey.

Henry R. Felix, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were David M. Cohen, Director; and Jeanne E. Davidson, Deputy Director.

John J. Galvin, Galvin & Mlawski, of New York, New York, for amicus curiae BP Oil Supply Company, Inc.

Before MICHEL, SCHALL, and PROST, Circuit Judges.

MICHEL, Circuit Judge.

Plaintiff–Appellant George E. Warren Corporation ("Warren") appeals the decision of the United States Court of International Trade granting summary judgment to the government in this civil action contesting the denial of Warren's protest. The court held that Harbor Maintenance Taxes ("HMTs") and Environmental Taxes ("ETs") paid by Warren on various imported petroleum products were ineligible for drawback refunds. *George E. Warren Corp. v. United States*, 201 F.Supp.2d 1366 (Ct. Int'l 2002). Despite the government's argument about prematurity and failure to exhaust administrative remedies, we hold the Court of International Trade did have jurisdiction, because the action contested denial of a protest concerning drawback for the two taxes. Further, the doctrine of futility excused further resort to administrative remedies. Because *Texport Oil Co.*

*v. United States*, 185 F.3d 1291 (Fed.Cir. 1999), held HMTs are not imposed "because of ... importation," as is required for drawback by 19 U.S.C. § 1313, we affirm as to that tax. Applying to the ETs the principle of *Texport* that to be eligible for drawback a tax must discriminate against imports as compared to exports or domestic shipments, we hold them also not based on importation because these taxes apply equally to both domestic and imported petroleum products. We therefore affirm as to them as well.

## BACKGROUND

Warren imported petroleum products on three different occasions from December 1995 to January 1996, paying regular customs duties and HMT on each occasion, and also paying ET on two of the three occasions. Subsequently, Warren exported petroleum products that were "commercially interchangeable" with the imported merchandise, a statutory prerequisite for "drawback" refunds. Based on the exportation, on July 15, 1996, Warren submitted drawback claims to the United States Customs Service ("Customs") requesting refund of the charges paid. On October 4, 1996, Customs "liquidated" the drawback entries and allowed a 99% drawback refund of the "Column 1 customs duties" pursuant to 19 U.S.C. § 1313(p). On January 3, 1997, Warren protested Customs' decision "to refuse to grant drawback of the HMT and ET paid in connection with the imported merchandise" and on February 26, 1997, Customs denied Warren's protest on the merits.

Warren then filed an action with the Court of International Trade. The government argued that the Court of International Trade lacked jurisdiction because it only has jurisdiction under 28 U.S.C. § 1581(a) where a valid protest has been denied. The government maintained that Warren

did not have grounds to file a protest since its original drawback request did not include HMTs or ETs and was granted as to regular duties, the only subject of the request. The government argued that, accordingly, there was no *valid* protest. The Court of International Trade, however, held that it did have jurisdiction because Customs' denial of the protest specifying the two taxes was made on the merits and it would thus have been futile for Warren to file a second drawback request specifying HMT and ET. *Warren*, at 1373. Although the two taxes were omitted from the original request for drawback, they were clearly raised in the protest and that was enough. *Id.* According to the court, Warren did not need to further exhaust administrative remedies and thus there was an actual controversy ripe for judicial review. *Id.*, at 1373.

Warren moved for summary judgment. The Court of International Trade then treated the government's arguments about the lack of merit of Warren's refund action as a cross motion for summary judgment and granted it. *Id.* at 1369. The court held that Warren's claims for drawback of HMTs and ETs were precluded by *Texport. Id.* With respect to the HMT, the court rejected Warren's argument that liability for HMT has the required "substantial nexus" to the act of importation simply because it has a nexus to the act of exportation for purposes of the Export Clause of the United States Constitution, citing *Texport's* specific holding that HMTs were not eligible for drawback. *Id.* at 1372. Finally, the court also concluded that Warren's argument that the HMT should be deemed a duty instead of a tax for drawback purposes was irrelevant as the "because of . . . importation" requirement of 19 U.S.C. § 1313(j) applies equally to taxes and duties and therefore whether HMTs are considered taxes or duties does not matter. *Id.* at 1372 n. 6.

For the ET, the trial court concluded that the ET is "a generalized charge assessed against all petroleum products, which is imposed on products prior to refinement and imported petroleum products regardless of their level of refinement at the time they are entered." *Id.* at 1374. Because of this conclusion, the trial court reasoned that ETs are "imposed in a nondiscriminatory manner on both imported and domestic petroleum products" and therefore do not have the necessary nexus to importation to qualify for drawback according to *Texport. Id.* at 1374.

Warren timely appealed the Court of International Trade's decision to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). Based on the sound reasoning of the trial court's careful opinion, we affirm.

## DISCUSSION

It is not disputed by either party but we note that summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ct. of Int'l Trade R. 56(c). Statutory interpretation is a matter of law that we review de novo. Lynteq, Inc. v. United States, 976 F.2d 693, 696 (Fed.Cir.1992).

### I. *Jurisdiction*

The government again argues that the Court of International Trade lacked jurisdiction because Warren did not contest the denial of a *valid* protest. The government asserts the protest was invalid because Warren did not request drawback of HMTs or ETs. The government argues that there was, therefore, no "refusal to pay" on the part of Customs. In effect, the government argues that drawback claims cannot first be raised in a protest. The government also maintains that it

would not have been futile for Warren to submit its drawback request for the HMTs and ETs and that Warren could belatedly have submitted such claims much later because amendments to the pertinent drawback statute provided a window of six months in 1999 in which Warren could have submitted such a request for drawback. According to the government, Warren did not exhaust its administrative remedies, which the government asserts is a prerequisite to Court of International Trade jurisdiction. We disagree.

■ The jurisdictional provision relied on by the Court of International Trade and Warren reads:

> § 1581. Civil actions against the United States and agencies and officers thereof
>
> (a) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930 [19 U.S.C. § 1515].

28 U.S.C. § 1581(a) (2000). Because the provision as worded requires only the denial of a protest to establish Court of International Trade jurisdiction, Customs' denial of Warren's protest on the merits is sufficient. The government cites no precedent refuting the trial court's common-sense reading of § 1581(a) or the logical link between futility—Warren knew that Customs would not refund HMTs and ETs because Customs already clearly denied Warren's claims for such drawback, albeit in the context of a protest—and the sufficiency of a denial of a protest for purposes of jurisdiction. That Warren *could* have filed new, independent requests for drawback of HMTs and ETs because of an extended time-window does not mean that it had to do so despite Customs having already ruled on the merits. When the government argues that a new filing by Warren would not have been futile, it con-

fuses administrative futility with time bars. Futility occurs where the filing party already knows that the agency would deny its claim because the agency has already done so. Parties are not required to perform useless acts to exhaust administrative remedies. *See Thomson Consumer Elecs., Inc. v. United States,* 247 F.3d 1210, 1212, 1214–15 (Fed.Cir.2001) (explaining generally the purpose of requiring exhaustion of administrative remedies and holding specifically that a protest is not required for the Court of International Trade to have jurisdiction over civil refund actions in which a protest to Customs would be futile because of Customs' lack of authority over the subject matter).

We, thus, hold that the Court of International Trade correctly concluded that under § 1581(a) it had jurisdiction over Warren's civil action contesting Customs' denial of Warren's protest.

## II. *Harbor Maintenance Tax*

■ Without doubt the Court of International Trade correctly interpreted *Texport* as ruling HMTs ineligible for drawback under 19 U.S.C. § 1313(j)(2); indeed that is the decision's express holding. Warren argues, however, that *Texport* was incorrectly decided because it is inconsistent with certain legislative history. In the alternative, Warren maintains that under a correct construction of 19 U.S.C. § 1313(j)(2), HMT and ET qualify for drawback because, Warren asserts, both are in fact imposed "because of importation."

■ We cannot simply overrule the *Texport* decision, even if we were persuaded (which we are not) that it is appropriate; to overrule a precedent, the court must rule en banc. *See Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed. Cir.1988) ("This court has adopted the rule that prior decisions of a panel of the court

are binding precedent on subsequent panels unless and until overturned in banc."). We assume that pursuant to Federal Circuit Rule 35 Warren seeks to persuade us to solicit the full court's consideration of this appeal (and an en banc decision overruling *Texport* ).[1] No petition for rehearing or rehearing en banc was filed by the plaintiff in *Texport* so it is perhaps unsurprising that Warren's brief and that of the amicus, BP Oil Supply Company, Inc., focus mainly on reasons for this court to overturn the holding of *Texport* in a way normally reserved for petitions for en banc rehearing. We will, therefore, examine Warren's arguments for overruling *Texport* to explain why we do not think an initial en banc hearing of this appeal is justified.

## A.

Broadly stated, Warren's primary argument is that the phrase "any duty, tax, or fee imposed under Federal law because of ... importation" necessarily means any duties, taxes, or fees "that attach while the goods are in Customs' custody," and not as *Texport* held, ones that are imposed discriminatorily on imported merchandise. As explained in *Texport,* § 1313(j)(2) requires that for charges to be eligible for drawback they must be (1) any duty, tax, or fee assessed under Fed-

eral law, and (2) assessed because of a good's importation.[2] *Texport,* 185 F.3d at 1296. The *Texport* opinion concludes that the first requirement is clearly satisfied for the HMT, but that the second must be analyzed in detail. *Id.* The *Texport* analysis then concludes that the "because of ... importation" requirement limits the scope of charges eligible for drawback to those with "a substantial nexus to the importation of merchandise," and that § 1313(j)(2) therefore precludes "the grant of drawback to a duty, tax, or fee that is assessed in a nondiscriminatory fashion against all shipments utilizing ports." *Id.* This understanding of the limitation imposed in § 1313(j)(2) is derived from the plain language of the provision itself. *Id.* at 1296–97. Because the phrase "because of ... importation" modifies the words "any duty, tax, or fee imposed under Federal law," all duties, taxes, or fees *not* assessed because of importation fall outside of that provision. The language thus establishes two categories of duties, taxes, and fees, one subject to drawback, and the other not. *Texport's* specific holding was: because the HMT is a generalized federal charge for *all* uses of certain harbors, it does not discriminate among exports, domestic shipments, and imports. Therefore it does not have the necessary nexus to importation of goods to qualify for draw-

---

1. Rule 35 states, inter alia, that counsel petitioning for initial hearing en banc must certify that the appeal "requires an answer to one or more precedent-setting questions of exceptional importance." Fed. Cir. R. 35(b)(1) (2003). Thus, hearing en banc, although rarely granted, may be appropriate where (1) the court must answer a question of exceptional importance and (2) the answer will create a precedent. We do not believe that this appeal, seeking to overturn *Texport,* fulfills either condition. *Texport,* a recent (1999), unanimous decision, in which the losing party did not even seek en banc rehearing, has already decided the question presented here. Even assuming it were precedent-setting and of exceptional importance, we are

not persuaded that the question warrants en banc consideration, given the weakness of Warren's arguments against *Texport.*

2. Section 1313(j) provides:

   if there is, with respect to imported merchandise on which was paid any duty, tax, or fee imposed under Federal law because of its importation ... [substitute merchandise that is exported or destroyed (under certain enumerated conditions),] ... the amount of each such duty, tax, and fee paid regarding the imported merchandise shall be refunded as drawback ... [up to 99% of the amount paid].

   19  U.S.C. § 1313(j)(2) (2000).

back refunds under § 1313(j)(2). *Id.* at 1297. In view of the persuasive reason of *Texport,* we reject Warren's statutory interpretation argument as unconvincing.

Warren also argues that the *Texport* decision was contrary to the legislative intent as reflected in certain portions of the legislative history. We see no flaw in *Texport's* analysis of the plain meaning of the text of § 1313(j)(2). Any conflicting indications in the legislative history cannot be dispositive. *See, e.g., Van Wersch v. Dep't of Health & Human Servs.,* 197 F.3d 1144, 1152 (Fed.Cir.1999) ("[The language of the statute] is crystal clear. Under these circumstances, we are not prepared to allow the extant legislative history, which we have described above, to trump the irrefutably plain language that emerged when Congress actually took pen to paper."). Furthermore, because many of Warren's arguments about legislative intent are based on its interpretation not of Congress' language but of omissions, they do not show error in *Texport,* but at most lend support to an alternate interpretation. That does not justify reassessing this precedent, en banc. For example, Warren argues "[h]ad Congress intended to limit drawback to duties, taxes and fees imposed discriminatorily on imports, there would have been some evidence of that intent in the legislative history...." That may be so, but not necessarily; the opposite is equally possible. The argument is simply too speculative. Thus, we would not urge the full court to hear this appeal.

## B.

Warren's second principal argument for drawback of HMTs ignores *Texport* and

focuses instead on decisions characterizing the HMT in certain contexts as a customs duty, as opposed to a tax. For example, Warren cites to *United States Shoe Corp. v. United States,* 296 F.3d 1378 (Fed.Cir. 2002), and emphasizes the court's holding that a statutory provision, 28 U.S.C. § 2411, providing for interest on tax refund judgments does not apply to HMT refunds because 28 U.S.C. § 2411 is not a customs law. Warren also cites a subsection of the HMT statute, 26 U.S.C. § 4462(f)(1), which provides that "except to the extent otherwise provided in regulations," all administrative and enforcement provisions of customs laws and regulations apply to the HMT "as if such tax were a customs duty." Warren argues that because the HMT is treated as if it were a customs duty for such purposes, then, ipso facto, HMT must be subject to the customs laws that govern drawback of duties. Thus, Warren baldly asserts that because the HMT is treated as if it were a duty, it is either not subject to the "because of ... importation" requirement in § 1313(j)(2), or it is by definition "because of ... importation."

Warren's arguments are unconvincing. First, it is far from clear that simply because 26 U.S.C. § 4462(f)(1) specifies that HMT is treated as if a duty for the administrative and enforcement provisions of Customs' laws and regulations, it must also be so treated for drawback purposes. The Harbor Maintenance *Tax* is still titled "Tax" and drawback does not fall under the categories of Customs' administration or enforcement, but instead under the category of importers' statutory entitlement.[3]

**3.** Similarly, in contrast to Warren's arguments, just because the statutory provision imposing the merchandise processing fee ("MPF"), 19 U.S.C. § 58c(g)(2), provides that the MPF must be treated as a duty for all administrative and enforcement purposes "other than drawback," it does not mean that the parallel language in the HMT statute which leaves out an "other than drawback" clause must mean that the tax should be treated as a duty for purposes of drawback. Warren again reads too much into an omission by Congress.

Second, and more importantly, even if the HMT were in every way a duty, § 1313(j)(2) does not suggest that duties are treated differently from taxes. That section actually provides identical treatment for "any *duty*, tax, or fee." 19 U.S.C. § 1313(j)(2) (emphasis added). Nor does any cited authority suggest that once a charge is treated as if a duty for any purpose, the "because of ... importation" requirement is somehow automatically satisfied simply as a result of such designation. Nor do we find the argument logical. Thus, we see no convincing reason for en banc hearing.

### C.

Finally, Warren argues that even under the *Texport* test, the HMTs qualify for drawback; i.e., Warren purports to meet *Texport's* test while avoiding its express holding that HMTs are ineligible for drawback refunds. Warren equates discriminating between imports and non-imports with imposing charges on goods while in Customs' custody by noting that it is during Customs' custody that "Column 1 duties," which are clearly eligible for drawback, are imposed. Warren's logic is faulty. The collection method alone does not show discrimination as defined by *Texport*. Specifically, we do not agree that a difference in collection method, agency, or timing shows a difference that amounts to discrimination adequate to establish the nexus *Texport* requires between the tax and importation. Again, Warren fails to recognize that any arguable error does not warrant an en banc hearing.

### III. *Environmental Taxes*

■ As to the claims for drawback of the ETs, Warren argues that even if the rationale of *Texport* were applicable, the ET does in fact discriminate against imports. Warren's position is that "the [ETs] 'entered for consumption, use or warehousing' language [from 26 U.S.C. § 4611(a)(2) ] simply denotes imported merchandise, and that the requisite nexus exists between the ET and importation because the ET statute clearly imposes the tax on the *physical entry*, i.e., the importation, of petroleum products into the United States." (Emphasis in original.)

While Warren is correct that the language in § 4611(a)(2) covers *imported* petroleum products, § 4611(a) as a whole clearly covers *all* petroleum products, whether imported or created domestically. Section 4611(a), in pertinent part, provides:

General rule. There is hereby imposed a tax at the rate specified in subsection (c) on—

(1) crude oil received at a United States refinery, and

(2) petroleum products entered into the United States for consumption, use, or warehousing.

26 U.S.C. § 4611(a) (2000). Thus, § 4611(a) functions much as does the Beef Promotion and Research Act of 1985 ("Beef Act"), 7 U.S.C. §§ 2901–2911 (2000), in that the Beef Act taxes domestic *cattle* upon their sale but taxes imported beef *products* upon their entry into the country. *See generally Orleans Int'l Inc. v. United States*, 334 F.3d 1375 (Fed.Cir. 2003). The analogy shows that domestic commodities can frequently be taxed at a raw or early stage of their processing, long before they have reached the form desired by their ultimate consumers. Early taxation is indeed preferable because it is more comprehensive and efficient—a whole animal can be taxed at once, so the need to account for its many parts is avoided, as are gaps or repeats in taxation. Imported commodities, however, typically have to be taxed after all processing or at intermediate stages of processing, even though this is not optimal, because in their raw form they are beyond the reach of taxation, i.e.,

the United States clearly has no authority to tax goods produced and possessed outside the country, even if it could distinguish which crude oil (or which cattle) is ultimately bound for the United States. Thus, imported products are taxed "downstream" in their processing and domestic products in original form. But downstream taxation is not equivalent to discriminatory taxation.

Only if additional products were taxed, or higher rates applied to imported products, would there be any meaningful distinction between the treatment of imported and domestic goods and hence discrimination against imported products. While the ET collection method and agents differ for imports and domestic products, Warren makes no suggestion that the objective or result is to tax the two any differently in terms of scope or rates. The rate of taxation for both the domestic crude oil and the imported petroleum products is the same because subsection (c) applies a uniform rate to both. The sequential listing of domestic and imported products in subsections (1) and (2) of § 4611(a), thus, shows only that goods with different origins require different collection methods.

Nor are "petroleum products" a broader class than crude oil. Rather, they are identical in scope. The trial court quotes an excerpt from one of the government's briefs submitted to it that explains:

> Pursuant to 26 U.S.C. § 4611(a) & (b), ETs are imposed on domestic crude oil received at U.S. refineries, on petroleum products imported into the United States, and on domestic crude oil used in the United States or exported, provided the tax had not been imposed previously. The term "crude oil" includes crude oil condensates and natural gasoline. 26 U.S.C. § 4612(a)(1). The term "petroleum product" includes crude oil. *Id.* § 4612(a)(3). The legislative history to these statutory provisions further explains that the oil subject to tax is "crude oil, including crude oil condensate and natural gasoline" and that "petroleum products" include crude oil, crude oil condensate, natural and refined gasoline, refined and residual oil, *and any other hydrocarbon product derived from crude oil or natural gasoline ...*" H.R.Rep. No. 96–1016, pt 2, at 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6151 (emphasis added).

> Thus, contrary to Warren's claim that the ET leaves domestic petroleum products untaxed, the legislature recognized that domestic petroleum products would be "derived from crude oil or natural gasoline" that were [sic] already separately taxed. This reading of the legislative intent is further consistent with 26 U.S.C. § 4612(b), which assures that taxes are imposed only once on any petroleum product. *See* H.R.Rep. No. 96–1016, pt 2, at 5.

*Warren,* at 1374 (quoting Defendant's Reply to Plaintiff's Collective Response to Defendant's Corrected Briefs, at 8–9). Warren does not dispute the government's explanation of the statutory definitions of the words "petroleum products" and "crude oil" or suggest that there is any error in the trial court's reliance on the government's explanation. And indeed, our review of the quoted paragraphs and authorities cited therein confirms that all "petroleum products" are indeed derived from "crude oil."

Thus, although, read alone, § 4611(a)(2) may appear to tax a product "because of its importation," when the provision as a whole is read, the tax is really imposed not because the product is imported, but *because it is a petroleum product.* There is no difference in scope between crude oil and petroleum products—they merely represent different stages of refining.

# 1356

Therefore the ET does not discriminate against imports in the way *Texport* requires in order for a tax to be eligible for drawback, and the trial court's rejection of Warren's claims for drawback of ETs was correct.

■ Finally, while drawback for ET is arguably a question of first impression, we are unpersuaded it warrants en banc hearing. Even assuming it is of "exceptional importance," it is so analogous to HMT that *Texport* controls. Thus, it is not truly a "precedent-setting question," and as we have already explained, Warren's assertions of error in *Texport* are weak.

## CONCLUSION

The Court of International Trade correctly exercised jurisdiction over this civil action contesting an on-the-merits denial of a drawback protest by Customs and properly applied this court's decision in *Texport* in sustaining that denial. Warren has shown no question that is precedent-setting or of exceptional importance or any question not correctly resolved by *Texport* and thus no justification for en banc hearing of this appeal. Under *Texport,* Warren's claim for HMT is absolutely foreclosed. Nor has Warren shown any error in the trial court's application of the *Texport* rule to the protest claim for drawback of ETs. We hold simply: like the HMT, the ET is not imposed on cargo "because of ... importation." On that basis, the trial court's decision upholding Customs' denial of Warren's drawback protest must be and is, hereby,

*AFFIRMED.*